FILED
2022 MAR 14
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FIRST GUARANTY BANK,<br><br>Plaintiff,<br>v.<br><br>REPUBLIC BANK, INC. nka RB PARTNERS, INC.,<br><br>Defendant. | **MEMORANDUM DECISION AFTER A BENCH TRIAL: FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 1:16-cv-00150-JNP-CMR<br><br>District Judge Jill N. Parrish |

Republic Bank[1] sold a number of equipment leases[2] to First Guaranty Bank by way of a lease purchase contract. Two of the lessees stopped making payments after this transaction. First Guaranty sued Republic for both rescission and breach of the contract, arguing that it should be compensated for the costs of pursuing collection efforts against the defaulting lessees. The court held a bench trial on these two claims. Based on the evidence presented at trial and the briefing of the parties, the court makes the following findings of fact and conclusions of law. The court finds in favor of Republic on First Guaranty's rescission claim. The court finds in favor of First Guaranty on its breach of contract claim and awards $244,417.84 in damages. Additionally, the court denies First Guaranty's requests for prejudgment interest and for an award of attorney fees for this lawsuit.

---

[1] After this litigation started, Republic became RB Partners, Inc.

[2] Many of the "leases" at issue in this case are actually financing agreements whereby a lender loaned money to a purchaser to buy commercial equipment. The purchaser agreed to make monthly payments to the lender until the loan had been paid off, at which point the lender would transfer title to the equipment to the purchaser. The lenders, however, labeled these agreements as leases in an apparent bid, at least in part, to obtain more favorable treatment in court if the purchaser failed to make timely payments. Because the parties and the court have referred to these agreements as leases throughout this litigation, the court continues to use the term "leases" in these findings of fact and conclusions of law.

## FINDINGS OF FACT

*A.  Med One Finances the Pioneer Lease and the Sherman Grayson Lease. It Then Sells the Right to Receive the Lease Payments to Republic. Med One Retains Servicing Rights and Responsibilities.*

Republic was a bank in the business of purchasing commercial equipment leases from entities that originated the leases—known in the industry as "vendors"—and then collecting the monthly payments owed on those agreements until the end of the lease term. Republic earned a profit on a lease if it collected more in monthly payments than it paid to the vendor for the right to receive the payments. Republic purchased leases from a variety of vendors.

Republic had a longstanding relationship with Med One Capital Funding, LLC, which finances purchases of medical equipment. Almost half of Republic's portfolio consisted of leases originated by Med One. In February 2010, Republic and Med One executed a contract entitled the Master Assignment of Leases and Progress Funding Agreement (Med One Agreement). This contract governed Med One's sale of leases to Republic. The Med One Agreement provided that Republic would receive the monthly payments due on the leases that it purchased. But Med One retained the right to service the monthly payments. Thus, Med One continued to collect payments from the lessees. It would then forward the payments to Republic. It was important to Med One to retain the servicing rights because it wanted to maintain a direct relationship with its customers.

The Med One Agreement required Med One to "[u]ndertake normal collection actions to collect past due and charged off accounts." Republic could terminate Med One in its role of servicer only if it violated the Med One Agreement, became bankrupt, or committed fraud in connection with its servicing duties. The Med One Agreement also provided that the "rights and obligations of the parties hereunder may not be assigned without the prior written consent of the other party."

In December 2011, Pioneer Health Services, Inc, an entity that owned and operated several hospitals, purchased equipment, software, and implementation and maintenance services from McKesson Technologies, Inc. Med One financed this transaction. In April 2012, Med One entered into a Conditional Sales Agreement (Pioneer Sales Agreement) with Pioneer. This contract listed four separate items:

   (1) Paragon Hospital Information System – as described in Contract
       # 1-18XKQT ($1,772,334.00),
   (2) Paragon Hospital Information System – as described in Contract
       # 1-18X8C9_PS4A ($132,000.00),
   (3) Software – as described in Contract # 1-18X8C9_PS6 ($363,303.99), and
   (4) Paragon Interface Implementation Service – as described in Contract
       # 1-18X8C9_PS6 ($146,029.56).

The Pioneer Sales Agreement defined these four items as "Equipment" and required Pioneer to pay for the Equipment by remitting 60 monthly payments to Med One. The first 12 payments were $25,000 each. The next 48 payments were $54,594 each. The contract stated that Med One "shall retain title to the Equipment for legal and security purposes" until Pioneer had remitted all 60 monthly payments in full. After all payments had been made, Med One agreed to transfer title to the Equipment to Pioneer.

Med One subsequently sold its right to receive the monthly payments owed under the Pioneer Sales Agreement to Republic. This transaction was controlled by the Med One Agreement. Accordingly, Med One retained the right to service the monthly payments. Med One was fully compensated for performing these servicing duties through the purchase price of the lease and was not owed any further renumeration for servicing the lease. In April 2012, Med One filed a UCC financing statement for the equipment listing both Republic and Med One as secured parties for the Equipment provided to Pioneer.

Med One also entered into a similar lease agreement for the Paragon Hospital Information System with Sherman Grayson Hospital. Med One then sold the stream of monthly payments to Republic. Pursuant to the Med One Agreement, Med One retained the servicing rights for the Sherman Grayson lease as well.

*B. Republic Sells Several Leases to First Guaranty, Including the Pioneer Lease and the Sherman Grayson Lease.*

Sometime in 2012, Republic formulated a plan to liquidate the bank through the sale of its assets, including its lease portfolio. Republic's goal was to close by the end of 2016. Because some of the monthly payments on the leases owned by Republic extended beyond 2016, Republic began looking for other banks that would be willing to purchase the leases. Around this time, First Guaranty was interested in getting into the business of purchasing equipment lease agreements. In 2014, a broker introduced Boyd Lindquist, the president and CEO of Republic, to Alton Lewis, the president and CEO of First Guaranty. Republic and First Guaranty began to discuss the potential sale of lease agreements to First Guaranty.

Republic established an electronic data room so that interested buyers could review documents related to the leases that Republic was offering for sale. Although a number of documents in the data room referenced the existence of the Med One Agreement, Republic did not include the agreement in the data room. The data room also contained lease summaries created by Republic. At least some of the summaries for leases originated by Med One stated: "Med One will continue to service the transaction during its remaining term by providing the services of billing, collecting, sales, use and property tax reporting." Employees of First Guaranty reviewed documents in the data room as part of First Guaranty's due diligence. But this review was confined to a credit perspective—i.e., evaluating the likelihood of nonpayment and the value of the

collateral. First Guaranty did not request a copy of the Med One Agreement, nor did it ask any questions about the servicing arrangement between Republic and Med One.

After conducting its due diligence review, First Guaranty submitted winning bids for 45 equipment leases. About half of these leases had been originated by Med One. The remaining leases had been originated by various other vendors. On December 24, 2014, Republic and First Guaranty executed a Portfolio Purchase Agreement (First Purchase Agreement), which transferred the 45 leases to First Guaranty.

Around this time, Republic's CFO and a senior vice president, Nicole Lengel, discussed the servicing of the Med One leases with First Guaranty's chief credit officer, Randy Vicknair. Lengel informed Vicknair that Republic had an agreement with Med One and that Med One would do all of the servicing for the leases after they were sold to First Guaranty. Lengel further stated that because of the agreement between Med One and Republic, Med One preferred to deal directly with Republic after the leases were sold. Accordingly, Med One would continue to collect payments in a "lock box" account. Med One would then forward the payments from the lock box to Republic, which would then relay the payments to First Guaranty. Lengel said that once Republic completed the planned liquidation process, Republic would need to transition the servicing agreement to First Guaranty so that it could deal directly with Med One. Vicknair stated that First Guaranty was fine with this arrangement. On January 8, 2015, Lengel sent an email to Vicknair providing the contact information for six servicers for the non-Med One leases transferred by the First Purchase Agreement. But Lengel did not provide any contact information for Med One, stating: "as we discussed contact me directly with any questions" regarding the Med One leases.

Between December 24, 2014 and May 2015, Med One continued to service the leases that had been sold to First Guaranty. Med One collected the payments and transferred them to Republic, which then sent the payments to First Guaranty. First Guaranty had no contact with Med One during this period of time. Before May 2015, Lewis knew that Med One was servicing the financing agreements and that it would continue to do so until all payments had been remitted.

After Republic and First Guaranty executed the First Purchase Agreement, they began to negotiate a second sale of leases. As before, Republic established an electronic data room containing documents related to the leases for First Guaranty and other potential buyers to review. The documents referenced the Med One Agreement and stated that Med One would continue to service the payment obligations on the Med One leases until they were paid off. Once again, First Guaranty did not ask for a copy of the Med One Agreement, nor did it inquire about the servicing agreement between Republic and Med One. First Guaranty only conducted a due diligence inquiry regarding the credit worthiness of the lessees.

On May 26, 2015, Republic and First Guaranty executed a second contract for the purchase of equipment leases (Second Purchase Agreement). The Second Purchase Agreement contained terms that were almost identical to the First Purchase Agreement. Under this contract, First Guaranty agreed to purchase eight additional leases, including the Pioneer lease and the Sherman Grayson lease. All eight of the leases had been originated by Med One. At the time that the parties executed the Second Purchase Agreement, the servicing rights for the leases were not material to First Guaranty's decision to enter into the contract. First Guaranty's primary considerations were the likelihood of default on the obligations and the value of the collateral, not the identity of the servicer or the right to assume servicing obligations at a future date.

Both the First and Second Purchase Agreements contained provisions requiring First Guaranty to administer the leases in its own name. Both of the Purchase Agreements also required Republic to provide a copy of its electronic letterhead to First Guaranty so that it could give notice to the lessees that their lease had been transferred to First Guaranty. A copy of a sample "hello-goodbye letter" informing the lessee of the transfer was attached to the First Purchase Agreement. But because both parties understood that Med One would continue to service all of the leases transferred by the Second Purchase Agreement, the parties did not attach a copy of the sample hello-goodbye letter to the second contract. Indeed, when the parties executed the Second Purchase Agreement, both Republic and First Guaranty understood that the provision requiring First Guaranty to administer the leases in its own name would not be enforced because Med One would continue to service all of the leases that it had originated.

*C. Pioneer Declares Bankruptcy. First Guaranty Pays for Attorney Fees and Costs Related to the Bankruptcy Proceedings.*

On March 30, 2016, Pioneer declared bankruptcy and stopped making payments due under the Pioneer Sales Agreement. The bankruptcy court set a deadline of July 28, 2016, for creditors to file a proof of claim. In April or May 2016, Med One notified Republic of the Pioneer bankruptcy filing. But despite repeated inquiries as to why Pioneer had stopped making payments, Republic did not notify First Guaranty of the bankruptcy filing or the proof of claim deadline. Frustrated with the lack of information regarding the delinquent Pioneer lease, on July 27, 2016, Lewis traveled from Louisiana to Utah to meet with Republic. At this meeting, Lindquist and Lengel informed Lewis for the first time that Pioneer had declared bankruptcy. On July 28, 2016, Med One, on behalf of itself and any assignee, filed a timely proof of claim for the amount Pioneer still owed under the equipment lease.

By the time that First Guaranty had consulted its lawyers regarding the Pioneer bankruptcy, the claim deadline had passed. On August 19, 2016, First Guaranty filed a late proof of claim for the amount still owed under the Pioneer lease agreement. Meanwhile, First Guaranty contacted Med One and requested that it amend its proof of claim to explicitly name First Guaranty as a successor in interest to the Pioneer lease. Med One agreed, and on September 2, 2016, it filed an amended proof of claim that explicitly named First Guaranty as an assignee of the right to receive the lease payments. Also on September 2, 2016, First Guaranty and Med One filed a joint response to a motion filed by McKesson to compel Pioneer to pay software licensing fees related to the equipment subject to the Pioneer Sales Agreement. In the objection, First Guaranty and Med One argued that they were in the same position as McKesson and that the bankruptcy court should order Pioneer to make lease payments to First Guaranty as an administrative claim.

In mid-September 2016, Med One decided that it no longer wished to service the leases that Republic had sold to First Guaranty. In a September 14, 2016 email, Med One's senior vice president and CFO, Jeffrey Easton, informed Lengel that Med One would be transferring its servicing rights to Republic. Easton stated that First Guaranty's and Med One's simultaneous participation in the Pioneer bankruptcy was duplicating costs and creating confusion in those proceedings. Of greater concern to Med One, however, was the fact that First Guaranty had suggested that it had the right to control Med One's servicing of the leases—a contention that Med One strongly disagreed with. On September 22, 2016, Republic agreed to accept all of the servicing rights for the Med One leases. Republic then transferred the servicing rights to First Guaranty.

On September 29, 2016, the bankruptcy court entered an amended order granting in part McKesson's motion to compel Pioneer to pay software licensing fees. The court, however, did not resolve First Guaranty's and Med One's request for an order requiring Pioneer to make lease

payments. On October 4, 2016, First Guaranty and Med One filed a motion to compel Pioneer to make lease payments, arguing that it had an administrative claim to the payments. In March 2017, the bankruptcy court issued an order denying the motion. The court concluded that because the Pioneer Sales Agreement was not a true lease, First Guaranty did not have a valid administrative claim to the lease payments.

First Guaranty filed a motion to reconsider, which was denied in June 2017. First Guaranty then appealed the bankruptcy court's ruling to the District Court for the Southern District of Mississippi. In November 2017, the district court summarily affirmed the bankruptcy court's orders. First Guaranty then appealed to the Fifth Circuit. While the appeal was pending, First Guaranty filed additional motions and objections in the bankruptcy court based upon its contention that it was entitled to an order compelling Pioneer to make lease payments as an administrative claim. For example, First Guaranty filed an objection to Pioneer's motion to assign software rights to a third party, a second motion to compel Pioneer to make the lease payments, a motion to stay the bankruptcy proceedings pending a ruling on its appeal to the Fifth Circuit, and an objection to Pioneer's liquidating plan of reorganization. In all of these filings, First Guaranty argued that the bankruptcy court should delay taking any action related to the leased property until the Fifth Circuit resolved the issues on appeal.

In July 2018, the unsecured creditors committee filed a motion requesting that the bankruptcy court value First Guaranty's administrative claim and secured claim as having an estimated worth of $0. On August 3, 2018, First Guaranty opposed the motion, arguing that its administrative claim and its secured claim should have an estimated value equal to the amount claimed by First Guaranty: $690,223.66. On August 7, 2018, the Fifth Circuit affirmed the bankruptcy court's ruling that the Pioneer lease was not a true lease, mooting First Guaranty's

arguments that it was entitled to an administrative claim for the lease payments. In September 2018, the bankruptcy court granted the motion filed by the unsecured creditors committee. The bankruptcy court determined that First Guaranty had neither a valid administrative claim nor a valid secured claim, leaving a general unsecured claim against Pioneer in the amount of $690,223.66.

The bankruptcy court then confirmed a liquidation plan for Pioneer and appointed a liquidating trustee. In April 2019, the liquidating trustee objected to First Guaranty's unsecured claim as untimely and duplicative. First Guaranty settled the dispute with the liquidating trustee, and in June 2019, the trustee and First Guaranty stipulated to an order confirming that First Guaranty had a valid unsecured claim in the amount of $690,223.66. The liquidating trustee paid First Guaranty a total of $214,901.37 on this claim.

First Guaranty contends that it paid three law firms a total of $413,729 for attorney fees and costs related to the Pioneer bankruptcy. None of the actions First Guaranty took in the bankruptcy proceedings improved its position or caused it to receive additional funds from the bankruptcy estate. Indeed, First Guaranty's filings decreased the amount that it ultimately received because bankruptcy estate funds were used to pay attorneys to oppose these filings.

*D. First Guaranty Sues Lackey for Amounts Still Owed Under the Pioneer Lease. First Guaranty Pays for Attorney Fees and Costs Related to this Lawsuit.*

In May 2018, while the bankruptcy proceedings were still pending, First Guaranty sued Independent Healthcare Management, Inc, d/b/a Lackey Memorial Hospital (Lackey) in the United States District Court for the Southern District of Mississippi.[3] First Guaranty asserted that Lackey was one of the entities bound by the Pioneer Sales Agreement. In October 2019, that court granted

[3] Lackey did not declare bankruptcy.

summary judgment in favor of First Guaranty on the issue of liability for the unpaid lease payments. But the court concluded that First Guaranty had failed to provide sufficient evidence of the remaining amount owed for the Pioneer lease. First Guaranty filed a second motion for summary judgment, but in February 2020, the court denied the second motion because First Guaranty had provided inconsistent and incomplete documentation of the unpaid balance owed on the Pioneer lease. In March 2020, Lackey paid First Guaranty $387,500 to settle the lawsuit. First Guaranty paid a total of $91,526.84 for attorney fees and costs related to the Lackey litigation.

*E. Sherman Grayson Stops Making Lease Payments. First Guaranty Incurs Attorney Fees and Costs Related to its Negotiations with Sherman Grayson.*

By early 2016, Sherman Grayson stopped making lease payments. First Guaranty negotiated with Sherman Grayson and agreed to accept a partial payment for the remaining amount owed. First Guaranty incurred $1,391 in legal fees and $1,500 in equipment appraisal fees, for a total of $2,891, related to these negotiations.

*F. First Guaranty Sues Republic.*

In October 2016, First Guaranty sued Republic in this court, asserting two claims. First, it asserts that it is entitled to rescission of the Second Purchase Agreement based upon material misrepresentations. First Guaranty argues that its remedy under this claim is to be placed in the same position it would have occupied had it never entered into the Second Purchase Agreement by requiring Republic to pay the attorney fees and costs for the Pioneer bankruptcy, the Lackey litigation, and the Sherman Grayson negotiations. Alternatively, First Guaranty asserts a claim for breach of the Second Purchase Agreement. It argues that Republic breached a number of the provisions of this agreement. But its principal contention is that Republic breached the agreement by failing to transfer Med One's servicing obligation to it. First Guaranty contends that it was damaged by this breach because it had to pay for costs associated with the Pioneer bankruptcy, the

Lackey litigation, and the Sherman Grayson negotiations rather than relying on Med One to foot the bill. The court held a four-day bench trial on these two claims.

## CONCLUSIONS OF LAW

### I. RESCISSION FOR MATERIAL MISREPRESENTATIONS

First Guaranty asserts a claim for rescission of the Second Purchase Agreement due to alleged material misrepresentations made by Republic.[4] A contract can be rescinded for a fraudulent or material misrepresentation when (1) "there is a misrepresentation" by one party, (2) the misrepresentation was "fraudulent or material," (3) "the misrepresentation induced the recipient to make the contract," and (4) the "recipient was justified" to rely on the misrepresentation. *Miller v. Celebration Mining Co.*, 29 P.3d 1231, 1235 (Utah 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981)). Rescission is an equitable remedy left to the discretion of the court. *Acton v. Deliran*, 737 P.2d 996, 999 & n.5 (Utah 1987).

First Guaranty argues that it is entitled to rescission under two broad theories. First, it contends that the court should rescind the Second Purchase Agreement because Republic made material representations within the provisions of the contract itself. Second, First Guaranty asserts that rescission is appropriate because Republic failed to disclose that the Med One Agreement prohibited Republic from assigning servicing rights to First Guaranty unless Med One agreed to the assignment in writing. First Guaranty further argues that because it is entitled to rescission, the court should place it in the same economic position that it would have occupied had it never entered

[4] First Guaranty cites *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979) for the proposition that "a party to a contract has a right of rescission and an action for restitution as an alternative to an action for damages where there has been a [m]aterial breach of the contract by the other party." *See also* 26 WILLISTON ON CONTRACTS § 68:2 (4th ed. 2021). Although First Guaranty pled a garden-variety breach of contract claim, it has not asserted a claim for rescission based upon a material breach. Therefore, material breach caselaw does not apply to First Guaranty's claim for rescission for material misrepresentations.

into the Second Purchase Agreement. First Guaranty collected slightly more money from the lessees than it paid to Republic for the leases, for a profit of $35,986.56. But it also paid $506,755.84 for legal fees and other costs associated with collecting the amounts owed for the leases. By subtracting the lease profit from these expenses, First Guaranty asserts that it is entitled to $470,769.28 in rescissory damages.

The court finds that First Guaranty has not proven either of its recission theories and denies its request for an award of rescissory damages.

*A. Representations Made in the Second Purchase Agreement*

First Guaranty argues that Republic made multiple misrepresentations in the Second Purchase Agreement, including in the promises made in § 1.a and § 2.e and in the warranties made in § 3.a, § 3.b, and § 3.g. It contends that these provisions amount to a representation that First Guaranty would have "the right to service the leases directly or to oversee the servicing by a third party." ECF No. 276 at 5. First Guaranty appears to assert that its representatives read a draft of the contract, interpreted certain provisions of the draft contract to be representations made by Republic, and that these representations induced First Guaranty to sign the contract. Thus, it argues that breaches of the promises and warranties contained in the Second Purchase Agreement warrant the equitable remedy of rescission of the contract for material misrepresentations. First Guaranty, however, is not entitled to rescission under this theory for three principal reasons.

First, a party to a contract cannot convert a breach of contract claim into a rescission claim by arguing that the contract provisions themselves amounted to material misrepresentations that induced the party to sign the contract. Although not strictly binding here, the Utah Supreme Court's opinion in *HealthBanc International, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193 (Utah 2018) is instructive. In that case, the parties had entered into a contract containing a warranty provision. The counterclaim plaintiff brought a contract claim for breach of the warranty provision. The

counterclaim plaintiff also brought a tort claim for fraudulent inducement, asserting that it entered into the contract because of a fraudulent representation identical to that made in the warranty provision. The Utah Supreme Court held that the fraudulent inducement claim was barred by the economic loss rule because it overlapped completely with the contract claim. *Id.* at 196. In so holding, the court reasoned:

> Contracts are negotiated first and drafted second. To claim that a promise is independent of a contract simply because it was spoken prior to the formation of a contract would open the door to tort liability for all pre-contractual negotiations that were eventually enshrined in a contract. This exception would swallow the rule.

Id. at 197. The court also expressed concern that if "all claims for fraud in the inducement are extraneous or independent of the contract because they occur 'prior to the formation of the contract itself,' . . . every breach of warranty claim would be turned into a tort by a simple affidavit stating, in effect, that the warranty was spoken before it was written." *Id.* (alteration in original) (citation omitted).

Although the economic loss rule at issue in *HealthBanc* does not apply in this case because rescission is a contract remedy rather than a tort claim, *see First Guar. Bank v. Republic Bank, Inc.*, No. 1:16-cv-00150-JNP-CMR, 2019 WL 4736916, at *9 (D. Utah Sept. 27, 2019), the rationale for the *HealthBanc* holding persuades the court that the Utah Supreme Court would also reject a rescission claim where, as here, the material misrepresentations are the terms of the contract itself. A recission claim for fraudulent or material misrepresentation and a tort claim for fraudulent inducement are very similar. Both claims require the plaintiff to prove that it reasonably relied upon a false representation that caused it to enter into the contract.[5] The remedies for these two

[5] "To prevail on a claim of fraudulent inducement, a plaintiff must establish: (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in

claims are also functionally identical. A plaintiff that successfully asserts a fraudulent inducement claim can recover damages caused by the decision to enter into the contract. *See Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225–26 (Utah 2014). The remedy for a recission claim is the restoration of the status quo prior to the parties' agreement, which may include the recovery of monetary damages caused by entering into the contract. *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 457 (Utah 1993). Given the similarities between these two causes of action, the court concludes that the logic behind *HealthBanc* requires the court to likewise bar First Guaranty from converting a breach of contract claim to a rescission claim by simply showing that its agents read the contract before signing it. Otherwise, it would be a simple matter to avoid the holding of *HealthBanc* by merely recasting a fraudulent inducement claim as a claim for rescission for either fraudulent misrepresentations or material misrepresentations.

The court also concludes that First Guaranty's rescission theory based upon alleged misstatements found in the Second Purchase Agreement fails for another reason. Generally, an equitable remedy, such as rescission, is only available when there is no adequate remedy at law. *M.J. v. Wisan*, 371 P.3d 21, 35 (Utah 2016); *Ockey v. Lehmer*, 189 P.3d 51, 61–62 (Utah 2008); *Buckner v. Kennard*, 99 P.3d 842, 857 (Utah 2004). Moreover, an equitable remedy is not required "simply because a party's remedy at law failed." *Buckner*, 99 P.3d at 857. First Guaranty has an adequate remedy at law for the alleged misstatements made in the Second Purchase Agreement: a

---

ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225–26 (Utah 2014). Thus, a rescission claim may rest on either a fraudulent misrepresentation (i.e., a knowingly false representation made with the intent to induce the other party to enter into a contract) or a material misrepresentation (i.e., a knowingly or unknowingly false representation that would likely induce a reasonable person to enter into a contract), while a fraudulent inducement claim requires a fraudulent misrepresentation. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 162, 164(1) (1981).

breach of contract claim for damages caused by any failure to abide by the promises and warranties contained in the contract. First Guaranty does not request rescission to be released from any future obligations owed under the Second Purchase Agreement. The parties agree that the contract has run its course. There is no more money to be collected from lessees and no future contractual duties to comply with. First Guaranty instead seeks rescissory damages that are nearly identical to its claimed damages for breach of contract: recovery of its attorney fees and costs for collecting unpaid lease payments.[6] Because First Guaranty has an adequate remedy at law for any breach of the promises made in the contract, the equitable remedy of rescission is not available to it.

Finally, even if First Guaranty could bring a rescission claim based upon the terms of the Second Purchase Agreement, the court finds that it has not proven all of the elements of its rescission claim. In order to prevail on this claim, First Guaranty must show both (1) that the alleged misrepresentation was material[7] and (2) that the misrepresentation induced it to sign the contract. *Miller*, 29 P.3d at 1235. These two elements are closely related. "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." RESTATEMENT (SECOND) OF CONTRACTS § 162 (1981). Indeed, if a plaintiff proves the materiality element, courts presume that the inducement element has been met "in the absence of facts showing the contrary." *Miller*, 29 P.3d at 1235 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 167 cmt. b (1981)). Thus, these

[6] Because First Guaranty must subtract the $35,986.56 profit it realized from the Second Purchase Agreement from the $506,755.84 in legal fees and other expenses to be placed in the same position it held prior to entering into the contract, it requests a total of $470,769.28 for its rescission claim. Under its breach of contract claim, however, First Guaranty can keep the profits it realized under the contract and seek to recover the full amount of its legal fees and costs as damages: $506,755.84. Thus, First Guaranty's legal breach-of-contract remedy is potentially superior to its equitable rescission remedy.

[7] First Guaranty does not argue that the misrepresentation was fraudulent.

two elements coalesce into a single question: would First Guaranty have entered into the Second Purchase Agreement absent the alleged misrepresentation regarding First Guaranty's right to control Med One or to assume the servicing obligations itself?

The court finds that First Guaranty has failed to prove that any such misrepresentation was material or induced it to enter into the contract. Based upon the evidence presented at trial, the court finds that when the parties executed the Second Purchase Agreement, First Guaranty knew that Republic and Med One had a servicing agreement under which Med One would do all of the servicing of the leases it had originated. First Guaranty also knew that because of this servicing agreement, Med One would continue to service the leases until all payments had been collected. First Guaranty also understood that due to the servicing agreement, Med One would continue to deal exclusively with Republic after the leases were sold and that Med One would only release the lease payments to Republic, which would then relay the payments to First Guaranty. Indeed, Republic declined to pass on any contact information for Med One after entering into the First Purchase Agreement.

Thus, First Guaranty had received multiple indications that it would not be able to step in as the servicer of the lease payments or to directly control Med One. Despite this knowledge, First Guaranty never asked to see the Med One Agreement, nor did it ask any questions regarding the nature of Med One's servicing relationship with Republic. Because First Guaranty's only concern at the time of the Second Purchase Agreement was the creditworthiness of the entities obligated to make the monthly payments, the key representatives of First Guaranty were content to allow Med One to maintain an exclusive servicing relationship with Republic. In other words, First Guaranty was not concerned about who would service the leases or with having a direct relationship with the servicer.

First Guaranty relies upon the testimony of its President and CEO, Lewis, to support its contention that the ability to either step in and directly service the leases or to control the servicer was a material consideration. The court determines, however, that this testimony is not a reliable indicator of First Guaranty's priorities on May 26, 2015, when it executed the Second Purchase Agreement. The question before the court is not what First Guaranty now believes to be material given 20/20 hindsight and years of litigation with Republic, but rather what was important to First Guaranty when it signed the contract. The actions and opinions of First Guaranty's agents prior to signing the contract are the most reliable indicators of what was material during this period of time.[8] As noted above, First Guaranty knew that Med One would continue to service the leases that it had originated pursuant to an agreement with Republic. First Guaranty also knew that it would not be able to communicate with Med One and that Med One would continue to forward the monthly payments to Republic rather than directly to First Guaranty. Despite this knowledge, First Guaranty never asked to see the Med One Agreement, nor did it ask any questions regarding the nature of its relationship with Med One. Thus, after considering all of the evidence, the court finds that the alleged misrepresentations in the Second Purchase Agreement were not material, nor did the alleged misrepresentations induce First Guaranty to sign the contract.

*B. Failure to Disclose the Nonassignment Provision of the Med One Agreement*

First Guaranty also argues that the Second Purchase Agreement should be rescinded because Republic failed to disclose that the Med One Agreement allowed Med One to retain the right to service the leases and prohibited Republic from assigning Med One's servicing rights and

[8] Lewis, for example, testified that it was important for First Guaranty to either directly service the leases or to control the servicer because it could be liable for violations of the Health Insurance Portability and Accountability Act (HIPAA) or debt collection laws. But there is no evidence that First Guaranty ever attempted to communicate with Med One to determine if it was complying with HIPAA or relevant debt collection laws.

obligations to a third party without prior written consent. First Guaranty asserts that if it had known about this provision, it would not have entered into the Second Purchase agreement.

The Restatement (Second) of Contracts, which the Utah Supreme Court relied upon when it adopted the rescission for fraudulent or material misrepresentation doctrine, states that non-disclosure of a fact can amount to a misrepresentation only under specific circumstances:

> A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:
>
> (a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.
>
> (b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
>
> (c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.
>
> (d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.

RESTATEMENT (SECOND) OF CONTRACTS § 161 (1981). First Guaranty has failed to prove its nondisclosure theory of rescission for three reasons.

The court need not determine whether First Guaranty has met this requirement because the court declines to award the equitable remedy of rescission when First Guaranty has an adequate remedy at law. *See M.J.*, 371 P.3d at 35; *Ockey*, 189 P.3d at 61–62; *Buckner*, 99 P.3d at 857. Under its nondisclosure theory of rescission, First Guaranty asserts that it would not have signed the Second Purchase Agreement if Republic had disclosed that the Med One Agreement gave Med One the right to retain servicing rights because the ability to assume the servicing rights or to directly control the servicer through a contractual relationship was an important consideration. First Guaranty's breach of contract claims replicate this theory of rescission. As discussed in more

detail below, First Guaranty argues that Republic violated § 1.a.i of the Second Purchase Agreement, which required Republic to transfer to First Guaranty "all rights and claims arising under or related" to the leases conveyed by the agreement. First Guaranty contends that Republic breached this provision because the nonassignment clause precluded Republic from conveying to First Guaranty its right to receive servicing from Med One. First Guaranty also argues that Republic breached § 2.e of the Second Purchase Agreement, which provides that First Guaranty "shall administer the Leases in [First Guaranty's] name." First Guaranty argues that this provision obligated Republic to transfer to it the right to service the leases in its own name. First Guaranty further asserts that Republic breached this provision because the Med One Agreement permitted Med One to retain the servicing rights to the leases.[9]

In other words, because Republic is bound by the servicing and nonassignment clauses of the Med One Agreement, First Guaranty contends that Republic has breached the promises made in § 1.a.i and § 2.e of the Second Purchase Agreement by failing to convey either the contractual right to receive servicing from Med One or the right to service the leases in its own name. Thus, First Guaranty has a breach of contract claim for any damages caused by Republic's failure to disclose the terms of Med One Agreement. These breach of contract claims completely overlap with the rescission claim for nondisclosure of the Med One Agreement. Where the parties agreed to terms that create a legal, contract remedy for any adverse effects to First Guaranty caused by

[9] During the summary judgment phase of this litigation, First Guaranty argued that § 3.b of the Second Purchase Agreement also guaranteed that Republic would transfer servicing rights to it and that the nonassignment clause of the Med One Agreement caused Republic to breach this promise. Although the court did not grant summary judgment in favor of Republic on this claim, the court expressed some skepticism that First Guaranty could prove any damages caused by a breach of this provision. ECF No. 114 at 5–8. At trial, First Guaranty did not argue that Republic breached § 3.b.

provisions of the Med One Agreement, the court declines to exercise its authority to award the equitable remedy of rescission for nondisclosure of this document.

Moreover, even were the court inclined to exercise its equitable powers, First Guaranty has not established the facts necessary to establish a claim for recission. Nondisclosure of a fact can be deemed to be a misrepresentation only if one of the four conditions listed in § 161 of the Restatement (Second) of Contracts has been satisfied. But First Guaranty has not identified which of these four conditions it relies upon. The court declines to formulate a theory of recovery on behalf of First Guaranty. Accordingly, First Guaranty has failed to prove that one of the four conditions of § 161 has been satisfied.[10]

Additionally, First Guaranty has not proven that Republic's failure to disclose the nonassignment clause was material or induced it to enter into the Second Purchase Agreement. For the same reasons stated in Part I.A above, the court finds that servicing rights to the Med One leases were not a material consideration for First Guaranty when it executed the Second Purchase Agreement.

---

[10] The court notes that if First Guaranty had argued that the nondisclosure of the nonassignment clause was actionable because the third of the four conditions listed in §161 of the Restatement (Second) of Contracts had been satisfied, the court would have rejected this assertion. Nondisclosure of a fact may be considered a misrepresentation if "the fact would correct a mistake of the other party as to the . . . effect of a writing." RESTATEMENT (SECOND) OF CONTRACTS § 161(c) (1981). The only provisions of the Second Purchase Agreement that arguably reference servicing of the leases are § 2.d, which required Republic to provide a copy of its electronic letterhead to First Guaranty so that it could give notice to the lessees that their lease had been transferred to First Guaranty, and § 2.e, which required First Guaranty to administer the leases in its own name. But when the parties entered into the Second Purchase Agreement, they both knew that these provisions of the form contract were a dead letter because Med One—not First Guaranty—would continue to service the eight leases transferred by the agreement. Indeed, First Guaranty never sent out a hello-goodbye letter for any of the Med One leases, nor did it attempt to administer any of these leases until well after Pioneer declared bankruptcy. Because § 2.d and § 2.e did not cause First Guaranty to mistake the effect of the Second Purchase Agreement, the court finds that this condition for asserting a nondisclosure rescission claim has not been satisfied.

 ## II. BREACH OF CONTRACT

First Guaranty argues that Republic breached a number of provisions of the Second Purchase Agreement, including § 1.a.i,[11] § 2.c, § 2.a, and § 2.e. "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230–31 (Utah 2014) (citation omitted). There is no dispute that the Second Purchase Agreement is a valid contract. Nor does Republic contest that First Guaranty fully performed its obligations under this agreement. The only disputes are whether Republic breached these provisions and the amount of any damages caused by a breach.

### *A. § 1.a.i*

#### 1) Breach

In § 1.a.i of the Second Purchase Agreement, Republic represented that it was transferring and assigning to First Guaranty its interest in the eight leases covered by the agreement, "including all rights and claims arising under or related" to Republic's interest in the leases. First Guaranty argues that Republic breached this provision because it did not transfer one of its rights related to the leases: the right to receive Med One's servicing obligations. The court agrees.

The Med One Agreement required Med One to "[u]ndertake normal collection actions to collect past due and charged off accounts." § 6(c)(viii). Thus, Republic had a contractual right to

[11] In addition to § 1.a.i, First Guaranty argued that Republic breached § 1.a.iii, § 3.a, § 3.b, and § 3.g. First Guaranty grouped these provisions with § 1.a.i, arguing that all of these provisions amounted to a promise that Republic would transfer all of its rights related to the leases to Republic. First Guaranty also asserted that breaches of these clauses resulted in the same damages: $505,255.84 in attorney fees and costs related to efforts to collect on the lease obligations. Because the court finds that Republic breached § 1.a.i., and because any damages for the breach of the other provisions would be identical, the court need not address Republic's claims for breach of § 1.a.iii, § 3.a, § 3.b, and § 3.g.

require Med One to perform normal collection actions for the leases that it purchased from Med One, including the Pioneer lease. This right to receive "normal collection actions" was undoubtably a right arising under or related to Republic's interest in the Med One leases. Accordingly, § 1.a.i of the Second Purchase Agreement required Republic to transfer Med One's contractual servicing obligation to First Guaranty.

Republic breached § 1.a.i because it did not transfer its right to receive Med One's servicing obligations to First Guaranty. The Med One Agreement contained a nonassignment clause, § 12(a), which provided: "The rights and obligations of the parties hereunder may not be assigned without the prior written consent of the other party." Because Med One never provided its written consent, its servicing obligations were never transferred to First Guaranty.

2)   Damages

Because Republic breached § 1.a.i, the court must determine whether First Guaranty has met its burden of proving damages caused by this breach. *See Christensen & Jensen, P.C. v. Barrett & Daines*, 194 P.3d 931, 938 (Utah 2008) ("[I]n a breach of contract action, the non-breaching party is required to show that the breach proximately caused the damages sought."). "Generally, an award of damages in a breach of contract case attempts to 'place the aggrieved party in the same economic position the party would have been in if the contract was not breached.'" *Id.* (citation omitted).

First Guaranty argues that if Republic had complied with its obligation to transfer its servicing rights under the Med One Agreement, it would have been able to rely on Med One to represent its interests in the Pioneer bankruptcy proceedings, the Lackey litigation, and the Sherman Grayson negotiations. Thus, it asserts that it would have avoided paying attorney fees and costs related to those proceedings. In other words, First Guaranty contends that it could have sat back and collected the amounts obtained in those legal proceedings and negotiations without

having to pay for the legal costs. First Guaranty requests an award of damages for three categories of expenses. First, it requests $412,338 for the attorney fees and costs associated with the Pioneer bankruptcy. Second, it asks for an award of $91,526.84 for the attorney fees and costs for the Lackey litigation. Third, First Guaranty seeks $2,891 for fees and costs related to the Sherman Grayson negotiation.

i.   Pioneer Bankruptcy

First Guaranty asserts that it paid a total of $412,338 to three law firms for legal work and costs related to the Pioneer bankruptcy. It paid $264,993.24 to Cavazos, Hendrick, Poirot & Smitham, P.C. (Cavazos), a Texas law firm that provided legal services for both the bankruptcy proceedings and for this litigation against Republic. First Guaranty also paid $97,098.76 to Jones Walker LLP, for work on the Pioneer bankruptcy between August 2016 and March 2018. Finally, it paid $50,246 to McGlinchey Stafford for work on the Pioneer bankruptcy between March 2018 and June 2019.

The court concludes that First Guaranty is entitled to only a portion of these claimed fees and costs because it has failed to prove that Republic's breach of § 1.a.i of the Second Purchase Agreement caused it to incur all of these expenses. The court's conclusion is based upon two independent findings of fact.

First, the court finds that Med One would not have performed all of the actions that First Guaranty undertook in the Pioneer bankruptcy. If Republic had satisfied its obligation under § 1.a.i of the Second Purchase Agreement, it would have transferred its rights under the Med One Agreement to First Guaranty. But if First Guaranty had stepped into Republic's shoes and assumed its rights and obligations under that contract, First Guaranty would not have had the right to control Med One's servicing of the Pioneer lease or to require it to perform any particular action in a

bankruptcy proceeding. Med One would be contractually bound only to "[u]ndertake normal collection actions" on behalf of First Guaranty. *See* § 6(c)(viii) of the Med One Agreement.

During the bench trial, Med One's vice president and CFO, Easton, testified that Med One considered pursuing a bankruptcy claim to be part of its servicing duties. Easton further testified that although Med One was willing to take input from the bank that had the right to receive the lease payments, it retained the right to proceed as it saw fit in a particular litigation. If the bank wanted to go beyond what Med One was willing to do, it would have to hire its own counsel. The court clarified this point with Easton:

> THE COURT: I suppose, then, your position is—and if I'm wrong about interpreting your answer, let me know—you'll proceed as you see fit. You may listen to input from them, but you'll still proceed as you see fit, and if they don't like it, then they can go hire their own attorneys at their own cost to pursue a different course.
>
> THE WITNESS: Yes.

Transcript at 473.

Thus, in order to determine the damages to award for the bankruptcy fees and costs, the court must determine which actions Med One would have taken in the bankruptcy proceedings and which actions Med One would have left for First Guaranty to perform. Based upon the testimony and exhibits presented at trial, the court determines that Med One would not have pursued the bankruptcy claim as aggressively as First Guaranty and would not have expended $412,338 in attorney fees and costs.[12] The court finds that Med One would have advanced the

[12] The court notes that neither party asked Easton or Med One's bankruptcy lawyers to describe what actions Med One would or would not have taken in the Pioneer bankruptcy proceedings if Med One had continued to service the Pioneer loan. Moreover, witnesses testified that Med One's bankruptcy lawyers pursued other claims for unpaid equipment lease obligations in the Pioneer bankruptcy. Evidence of the legal work that Med One's lawyers performed pursuing those claims would have been a persuasive indication of the actions that Med One would have taken on behalf of First Guaranty's claim in the same bankruptcy. But neither party introduced this evidence.

argument that First Guaranty was entitled to an administrative claim for the lease payments up until the bankruptcy judge issued its March 2017 order rejecting this argument. Given the importance of these issues, the court also finds that Med One would have paid its attorneys to oppose challenges to the secured claim and to oppose the liquidating trustee's challenge to the timeliness of First Guaranty's claim. The court concludes, however, that Med One would not have paid for attorney time spent pursuing the motion for reconsideration of the March 2017 order rejecting the administrative claim, the appeal to the district court, the appeal to the Fifth Circuit, or the numerous other filings made by First Guaranty designed to preserve its administrative claim. Thus, the court finds that the bulk of the attorney fees and costs that First Guaranty incurred in the bankruptcy were for actions that Med One would not have pursued.

Second, the court finds that not all of the legal bills presented by First Guaranty related to the bankruptcy proceedings. The largest legal bill presented to the court was for work allegedly performed for the bankruptcy proceedings by the Cavazos firm. But even a cursory review of the Cavazos billing records reveals that large portions of the work performed by this firm were for this litigation against Republic rather than the bankruptcy proceedings. Many billing entries are for communications with First Guaranty's Utah counsel regarding the Republic litigation. Other billing entries are for time spent drafting a demand letter addressed to Republic, reviewing documents related to Republic's discovery requests, preparing expert testimony for this case,[13] and

---

In proving damages for a breach of contract claim, a plaintiff must provide "sufficient evidence to enable the trier of fact to make a reasonable approximation" of the amount of damages. *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 (Utah 1983). Although First Guaranty may have been able to produce more probative evidence of the actions that Med One would have performed in the bankruptcy proceedings, the court concludes that it has sufficient evidence to make a reasonable approximation of the fees and costs that First Guaranty would have avoided had Med One performed its servicing obligations.

[13] One of the Cavazos attorneys testified on behalf of First Guaranty as an expert witness in the bench trial.

generally aiding the Republic litigation. Because Med One had no obligation to pay for attorney time spent on the Republic litigation, the billing entries for work related to this litigation are not relevant to First Guaranty's damages for breach of § 1.a.i of the Second Purchase Agreement.

Taking into account the legal services that Med One would not have performed in the Pioneer bankruptcy, and discounting billing entries for work related to this litigation, the court finds that if Republic had not breached § 1.a.i, First Guaranty would have avoided $150,000 in fees and costs associated with the bankruptcy proceedings. First Guaranty, therefore, is entitled to an award of $150,000 in damages related to the Pioneer bankruptcy.

ii. Lackey Litigation

First Guaranty paid the firm Watkins & Eager $91,526.84 to pursue a lawsuit against Lackey to recover amounts still owed under the Pioneer Lease. First Guaranty argues that it is entitled to recover this amount because Med One would have paid for this litigation if Republic had complied with § 1.a.i.

The court agrees. Easton confirmed that Med One pursues litigation to collect amounts owed on the leases that it services. The court finds that Med One would have sued Lackey and paid for all of the standard legal services performed by Watkins & Eager, such as conducting discovery and filing motions for summary judgment. Accordingly, First Guaranty proved that it is entitled to $91,526.84 in damages related to the Lackey litigation.

iii. Sherman Grayson Negotiation

Finally, First Guaranty incurred $2,891 in costs for attorney fees and equipment appraisal fees related to negotiations with Sherman Grayson, which resulted in a partial payment of amounts owed by the hospital. The court finds that Med One would have performed these services and that First Guaranty is entitled to a damage award for this amount.

*B. § 2.c*

Section 2.c of the Second Purchase Agreement required Republic to "forward to [First Guaranty] copies of all correspondence relating to the Lease or the Equipment which [Republic] receives from the Lessee or any other party." Republic received notice of the Pioneer bankruptcy in April or May of 2016, but it failed to forward notifications regarding the bankruptcy filing until July 27, 2016, one day before the deadline to file a proof of claim in those proceedings. First Guaranty argues that by failing to forward correspondence regarding the bankruptcy in a timely manner, Republic breached § 2.c.

This untimely disclosure of the bankruptcy did not affect First Guaranty's rights in the bankruptcy proceedings because Med One's notice of claim was broad enough to cover its claim. First Guaranty argues, however, that the late disclosure caused it to incur additional legal fees in order to find a way to pursue its claim in the bankruptcy court despite missing the deadline. The expert witnesses for both parties agree that First Guaranty incurred about $10,300 in attorney fees related to its efforts to ensure that it could assert its bankruptcy claims. All of these attorney fees were for work performed by the Cavazos law firm between August 11, 2016 and September 2, 2016.

First Guaranty concedes that its claim for $10,300 in attorney fees for breach of § 2.c overlaps with its claim for attorney fees for breach of § 1.a.i and that the court should not separately award damages for breach of § 2.c if it awards damages for breach of § 1.a.i. ECF No. 281 at 16. Although the court awards only part of the attorney fees requested by First Guaranty for its § 1.a.i claim, the full amount requested in the § 2.c claim is included in the court's award for breach of § 1.a.i. Because First Guaranty has no claim to additional damages, its § 2.c claim is moot.

*C.  § 2.a*

In § 2.a of the Second Purchase Agreement, Republic promised to deliver to First Guaranty "Files" within five days of the closing date of the contract. "Files" is defined by the agreement as "[t]he entire electronic copy of the lessor's file for each Lease, including the Lease, the Supplemental Documents, the credit reports, credit comments, default notices, material correspondence and any other additional books and records reasonably related to each Lease and an electronic copy of the billing and payment history for each Lease." First Guaranty argues that the Med One Agreement fits within the definition of "Files" and that Republic breached this provision because it did not deliver this document until over a year after the closing date.

First Guaranty, however, did not articulate any theory of damages resulting from this alleged breach. And the court is unable to discern how the delivery of the Med One Agreement to First Guaranty after the Second Purchase Agreement had been executed would have allowed First Guaranty to avoid any of the economic harms that it complains of. Without any evidence of damages, First Guaranty has failed to show that it is entitled to any recovery for the alleged breach of § 2.a.

*D.  § 2.e*

Finally, § 2.e of the Second Purchase Agreement provides that First Guaranty "shall administer the Leases in [First Guaranty's] name." First Guaranty argues that this provision obligated Republic to transfer to it the right to service the leases in its own name. First Guaranty further asserts that Republic breached this provision because Med One retained the servicing rights to the leases.

But once again, First Guaranty has not articulated how any such breach damaged it. It does not assert, for example, that if it had received servicing rights before late September 2016 that it could have collected more money from Pioneer, Lackey, or Sherman Grayson. Indeed, the

evidence before the court suggests that the ultimate outcome of the collection efforts would have been the same. Because First Guaranty has not presented any evidence or argument to suggest that any breach of § 2.e harmed it, First Guaranty is not entitled to any recovery on this claim.[14]

### *E. Conclusion*

In sum, the court concludes that First Guaranty proved all of the elements of its claim that Republic breached § 1.a.i of the Second Purchase Agreement. The court finds that First Guaranty is entitled to a total of $244,417.84 for damages caused by this breach.

## III. PREJUDGMENT INTEREST

First Guaranty argues that it is entitled to prejudgment interest on any award of damages. "Prejudgment interest may be recovered where the damage is complete, the loss has been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages." *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 666 (Utah 2016) (cleaned up). "Losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, requiring the fact-finder to be guided by [its] best judgment in assessing the amount to be allowed for past as well as for future injury." *Id.* (cleaned up).

Although the court's damages award on the breach of contract claim is based on attorney fee bills that contain amounts owed for six-minute increments of attorney time at fixed billing rates, the award itself cannot be calculated with mathematical certainty. In fixing the amount of damages, the court had to exercise its judgment to determine which legal actions Med One would

[14] Indeed, relatively early in this litigation, First Guaranty failed to articulate any theory of damages for its claims that Republic breached a contractual duty to convey servicing rights. In denying First Guaranty's motion for a prejudgment writ of attachment, the court noted that First Guaranty had not shown how a failure to transfer servicing rights prior to September 2016 resulted in any damages. ECF No. 114 at 5–8.

have taken and which legal strategies Med One would have left for First Guaranty to perform. Moreover, it is not possible to cleanly divide the attorney time between these two categories of fees based upon the billing descriptions recorded by the multiple attorneys that performed legal services for First Guaranty.

Because the court's damages award cannot be calculated with mathematical accuracy, the court denies First Guaranty's request for prejudgment interest.

## IV.   ATTORNEY FEES

Section 5 of the Second Purchase Agreement, entitled "INDEMNIFICATION AND SET-OFF," contains three paragraphs. Paragraph "a" states:

> [Republic] shall indemnify, protect, defend and hold [First Guaranty] harmless from and against any and all loss, liability, damage, cost or expense (including, without limitation, court costs and reasonable attorneys' fees) wheresoever and howsoever arising which [First Guaranty] . . . may incur as a result of: (1) any event or occurrence arising under or related to any Lease on or prior to the Closing Date related to [Republic] or its financing source's administration of such Lease; or (2) any breach by [Republic] of any of its representations, warranties, covenants or obligations set forth in this Purchase Agreement . . . .

Paragraph "b" goes on to list the conditions under which First Guaranty may be required to indemnify, protect, defend, and hold harmless Republic. Finally, Paragraph "c" provides:

> In the event any claim for indemnification under paragraphs "a" or "b" immediately above arises on account of any claim or action made or instituted against an indemnified party, the indemnified party shall notify the indemnifying party promptly after receipt of notice that such a claim or action is being made or was instituted . . . . The indemnifying party shall have the right to assume the defense thereof with counsel reasonably acceptable to the indemnified party.

Focusing on the first sentence of paragraph "a," First Guaranty contends that it is entitled to an award of attorney fees and costs for this litigation because these expenses were incurred as a result of Republic's breach of the representations and warranties found in the Second Purchase Agreement. The court disagrees for two reasons.

First, the language of the indemnification clause does not create a right to attorney fees in a direct action between First Guaranty and Republic. This court faced a similar claim for attorney fees based on a nearly identical indemnification provision in *Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1114–16 (D. Utah 2005). The indemnification provision in the *Canopy* case provided: "[Symantec] agrees to indemnify, hold harmless, and defend [Canopy] from all claims, damages, costs and expenses (including reasonable attorneys' fees) that arise from . . . [Symantec's] breach of any of the terms of this Agreement." *Id.* at 1114. The plaintiff in that case, Canopy, argued that the indemnification provision required the defendant, Symantec, to reimburse it for attorney fees incurred in a direct action between them. *Id.* at 1115. The court disagreed. Focusing on the indemnification provision's requirements that defendant Symantec both "indemnify" and "defend" plaintiff Canopy, the court ruled that the indemnification provision bound Symantec to indemnify and defend Canopy only in a lawsuit brought by a third party:

> [T]he parties' use of the term "defend" necessarily narrows the sweep of the indemnifying language. The use of the word "defend" indicates that the parties intended the provision to apply only to third-party claims because the word would have no effect in a direct action between the parties. Obviously, in a direct action between the parties, neither party would be interested in tendering its defense or being defended by the other party.

*Id.* The court ruled, therefore, that "construing the indemnification clause 'as pertaining only to third-party suits affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'" *Id.* at 1116 (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 200 (2d Cir. 2003), which similarly held that an indemnification clause was confined to third-party claims).

The reasoning of *Canopy* persuades the court that the indemnification provision of the Second Purchase Agreement likewise does not authorize an award of attorney fees in First Guaranty's direct action against Republic. First Guaranty's reading of the indemnification

provision would require Republic to simultaneously indemnify First Guaranty for its attorney fees and "protect" and "defend" First Guaranty in this action. It is illogical to interpret the indemnification provision to require Republic to defend First Guaranty in an action between them. Paragraph "c" of the indemnification provision further demonstrates that it applies only to third-party claims. This paragraph requires the indemnified party to give prompt notice of any claims or actions asserted against the indemnified party. Additionally, the indemnifying party has the right to assume the defense of the action with its own counsel, so long as the choice of counsel is acceptable to the indemnified party. These provisions make no sense in a direct action between the parties to the contract. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989) ("To extend the indemnification clause to require defendant to reimburse plaintiff for attorney's fees in the breach of contract action against defendant would render these provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties."). Thus, reading the indemnification provision as a whole and giving meaning to all of the words in the provision, the court concludes that the first sentence of paragraph "a" does not require Republic to pay for First Guaranty's attorney fees and costs for this action. *See Jones v. ERA Brokers Consol.*, 6 P.3d 1129, 1132 (Utah 2000) (courts must consider "the terms of [a] contract as a whole . . . giving meaning to each provision.").

Additionally, even if the first sentence of paragraph "a" required Republic to pay for First Guaranty's attorney fees in a direct action between them, the third sentence of paragraph "a" would relieve Republic from any such obligation under the facts of this case: "Notwithstanding the foregoing, [Republic's] obligation under this paragraph 'a' . . . shall be limited to losses, liabilities, damages, out-of-pocket costs and expenses as exceed in aggregate amount of $50,000.00 and as are incurred within one year after the Closing Date [May 26, 2015]." First Guaranty did not incur

attorney fees related to this lawsuit until August 2016, and it did not file its action until October 2016. Because all of First Guaranty's out-of-pocket costs and expenses for this litigation were incurred more than a year after the Closing Date, this provision exempts Republic from any obligation to indemnify First Guaranty for these fees.

**CONCLUSION AND ORDER**

The court concludes and finds as follows:

1. First Guaranty is not entitled to rescission of the Second Purchase Agreement.
2. First Guaranty has proven that Republic breached § 1.a.i of the Second Purchase Agreement and that it is entitled to an award of $244,417.84 for damages caused by this breach.
3. First Guaranty is not entitled to prejudgment interest on its damages award.
4. First Guaranty is not entitled to attorney fees or costs for this litigation.

DATED March 14, 2022.

BY THE COURT

Jill N. Parrish
______________________________
Jill N. Parrish
United States District Court Judge